(C. D. 1444)

THE B. F. GOODRICH COMPANY v. UNITED STATES

United States Customs Court, First Division

(Dated July 7, 1952)

*Saypol & Kotler (Leo Kotler* of counsel) for the plaintiff.
*Charles J. Wagner,* Acting Assistant Attorney General (*Joseph E. Weil,* special attorney), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges; COLE, J., dissenting

MOLLISON, Judge: This protest is directed against the refusal of the collector of customs at the port of Cleveland to allow drawback under the provisions of section 313 (a) of the Tariff Act of 1930 (19 U. S. C. § 1313 (a)) upon the exportation of certain rayon cord tire fabric manufactured or produced in the United States with the use of imported duty-paid rayon yarn. The grounds of disallowance by the collector were that the notice of intent to export, or a copy thereof, required by section 22.7 (*a*) of the Customs Regulations of 1943 (as it was in force and effect at the time here involved),[1] were not timely filed nor were they completed to show the name of the exporting vessel.

No issue arises as to the facts of importation, manufacture, and export, the question being solely one of compliance with the require-

---

[1] 22.7 **Notice of intent to export; local or direct shipments from a seaboard or frontier port.**—(a) At least 6 hours, but not more than 90 days, before the lading of merchandise which is to be exported from a seaboard or frontier port as a local or direct shipment therefrom, the drawback claimant or his agent shall file with the collector of customs at such port a notice of intent to export on customs Form 7511 in duplicate. A copy of the notice of intent shall also be delivered to the customs officer in charge at the place of lading at the time the merchandise is delivered to the exporting carrier. Such notices of intent shall show the name of the exporting vessel or other carrier, the place of lading, the kind of packages and their marks and numbers, the description of the merchandise, and its weight (gross and net), gauge, measure, or number. If the merchandise is to be exported in railroad cars, notice of intent shall be filed for each car.

ments of section 22.7 (a), *supra*. Compliance with such regulations has been held to be mandatory. *United States* v. *Ricard-Brewster Oil Co.*, 29 C. C. P. A. (Customs) 192, C. A. D. 191, and cases therein cited.

Reference to the official papers forwarded to the court by the collector establishes that the notice of intent attached thereto, bearing No. 5975, is dated May 18, 1948, and has thereon a stamp showing its time of filing to have been 2:55 p. m. on May 18, 1948, at the customhouse in New Orleans, the port of exit. The reverse side of said notice of intent contains a report of a customs inspector to the effect that he did not receive the notice of intent until May 20, 1948, 2 days after the exporting vessel, the S. S. *Stephen F. Austin*, sailed, but that reference to the records of the steamship company showed that packages of similar description were laden on the exporting vessel on May 17, 1948, at 4 p. m. It would, therefore, appear that notice of intent No. 5975 was not filed at least 6 hours prior to the lading of the merchandise, as required by section 22.7 (a), *supra*.

Plaintiff, however, does not rely upon the notice of intent described above in support of its claim herein that drawback should have been allowed. It is claimed that on April 28, 1948, some 19 days prior to the lading of the merchandise on the exporting vessel, there was presented by the agent of the plaintiff to the drawback division at the customhouse in New Orleans a proper and timely notice of intent, together with copies, indicating thereon the exporting vessel, and that acceptance of the said notice of intent and copies was refused on the ground that an export declaration had not been filed. It is, in effect, contended on behalf of the plaintiff that the refusal to accept the notice of intent on the ground stated was improper; that the failure to inspect the shipment was due to the fault of the defendant or its employees and not to the fault or omission of the plaintiff or its agent; and that drawback should, therefore, be allowed.

The issue has seemingly been resolved into the question of fact as to whether the plaintiff's agent tendered a timely notice of intent for filing, the defendant denying that such tender was ever made.

In support of its contention, plaintiff offered the testimony of Edgar J. Carriere. Mr. Carriere testified that, between December 1944 and August 1950, he was employed by the Dyson Shipping Co., plaintiff's agent, as a runner and clerk, and that among his duties were those of preparing and filing notices of intent in the case of shipments exported for benefit of drawback. Shown an original and five copies of a notice of intent dated "4/28/48/" relating to "35 rolls rayon cord tire fabric," which were admitted in evidence without objection as plaintiff's collective exhibit 1, he stated that he personally prepared those papers, brought them to the customhouse, and presented them

for filing at the appropriate window at about 10 a. m. on April 28, 1948.

The person who was in attendance at that window at that time was Mr. William H. Perez, a deputy liquidator in charge of the drawback division, and it is Mr. Carriere's testimony that upon offering the papers to Mr. Perez, the latter asked if there was an export declaration number in connection with the shipment, to which Mr. Carriere replied that "we didn't have any," whereupon Mr. Perez told him to "bring them back when you do have it."

Mr. Carriere testified that an export declaration number was assigned to the shipment on May 17, 1948, and that it was laden on board the exporting vessel on the same day. Whether this meant that the number was assigned by the proper governmental agency on that day is not made clear in the record.

On cross-examination, Mr. Carriere testified that at or about the time in question, he filed between 35 and 50 notices of intent per week at the customhouse and that besides Mr. Perez, a Mr. Collins and a Mr. Mayes, subordinates of Mr. Perez, were sometimes in attendance at the drawback window. He stated that when notices of intent, not having thereon export declaration numbers, were presented to Mr. Collins or Mr. Mayes, they accepted them, nevertheless, and later called his office, sometimes after the ship had cleared, to get the numbers. He stated that several times in such cases Mr. Perez had refused to accept notices of intent because they did not have an export declaration number on them.

The witness' testimony is not very clear on the point as to just when the export declaration number or numbers applicable to the shipment became available and known to the plaintiff or its agent. It would appear from his testimony that the notice of intent No. 5975 was prepared by the plaintiff, B. F. Goodrich Company. This notice indicates that it originated in Akron, Ohio, and contains the export declaration numbers. It would appear, therefore, that the plaintiff, B. F. Goodrich Company, knew the numbers in time to have prepared the notice of intent and dispatched the same to its agent, the Dyson Shipping Co., which may have been at least 6 hours before the lading of the goods on board the exporting vessel. The record seems to indicate that the witness, and presumably his employer, the Dyson Shipping Co., did not know the export declaration numbers until they received the notice of intent which was filed, and received the number 5975, but there is nothing to show that their principal, B. F. Goodrich Company, did not have knowledge of them prior to that time.

The defendant offered the testimony of Mr. William H. Perez, who, since the time of the happenings involved in this case, had retired from the Government service. After detailing his experience

of 39 years in the customs service and his familiarity with all phases of customs, Mr. Perez stated that he knew Mr. Carriere and his employer, the Dyson Shipping Co., and that although it was not his job, presumably because he was the head of the division, he very often, in order to help out, received and accepted tendered notices of intent.

Mr. Perez stated that he did not recall this particular case, and he was then asked by Government counsel a series of questions designed to elicit testimony as to (1) his practice at or about April 1948, with reference to the acceptance of notices of intent; (2) whether, at or about April 28, 1948, he refused to accept any notices of intent where the export declaration number was not on them; (3) whether he ever refused to accept notices of intent or a notice of intent which was tendered to him by Mr. Carriere on or about April 28, 1948, because it had no export declaration number on it; (4) whether he had occasion to telephone any shippers who tendered notices of intent to him to advise them to get him an export declaration number; and (5) whether he ever refused a notice of intent tendered to him by Mr. Carriere because it had no export declaration number on it.

Objection to each of these questions was made by counsel for the plaintiff which was sustained by the judge on circuit presiding at the trial.

Following Mr. Perez to the stand was Thomas E. Collins, who testified that he and Mr. Mayes were employed in the drawback division of the customhouse under the supervision of Mr. Perez at the time here involved and that at that time it was his and Mr. Mayes' practice to accept notices of intent whether they had export declaration numbers on them or not and to telephone some days subsequently to get the number. This practice, he said, had been instituted by Mr. Perez.

To recapitulate, on the issue as to whether plaintiff's agent tendered for filing a timely notice of intent lacking an export declaration number, there is direct, positive evidence on behalf of the plaintiff that such a tender was made and acceptance refused. The defendant sought to counter by offering evidence as to the practice of the drawback division, and its head, at the time in question with respect to the acceptance or rejection of such tenders. That an office practice in connection with such tenders existed, is established by the testimony of Collins, and this is, to some extent, corroborated by the testimony of Carriere to the effect that Collins and Mayes always accepted such tenders.

Under these circumstances, we are of the opinion that the evidence sought to be introduced by the defendant through witness Perez as to whether his conduct was in accordance with or contrary to the office practice was competent, material, and relevant, and should have been admitted. What weight would be assigned to it and whether it

would rebut the evidence on the matter offered by the plaintiff were matters to be determined from the entire record, including such evidence. *Joseph Rosenthal* v. *William R. Walker*, 111 U. S. 185, 28 L. ed. 395.

Wigmore on Evidence, third edition, volume 1, page 519, § 92, under the title "Circumstantial Evidence," and the subtitle "Evidence to Prove a Human Act," discusses the probative value of evidence of habit or custom, and states the general principle as follows:

Of the probative value of a person's habit or custom, as showing the doing on a specific occasion of the act which is the subject of the habit or custom, there can be no doubt.

Wigmore then points out that the probative value of such evidence depends upon the existence of sufficient regularity in the performance of the act, which, in turn, depends upon the circumstances of each case. He then distinguishes habit from character, and the question of the mechanics of proof of habit or custom from the principle involved, and makes the following summation:

Subject to the foregoing distinctions, the admissibility of a person's habit, usage, or custom as evidence that he did or did not do the act in question may be said to be universally conceded.

Counsel for the plaintiff in the brief filed in its behalf raises the question of the regularity of Mr. Perez' practice, contending that no foundation was laid showing Mr. Perez' experience in receiving notices of intent which would warrant the reception of evidence as to his practice. Mr. Perez demonstrated a familiarity with all phases of customhouse work, based upon 39 years' experience therein; he was the head of the drawback division; there was evidence that a regular office practice in such matters existed; and he was identified as the person who instituted the office practice followed by Collins and Mayes. We are of the opinion that these facts shown in the record establish the regularity of action spoken of by Wigmore, so that testimony by Perez of his own practice or participation in the office practice would be admissible as probative of what action he took on the specific occasion here in question.

The cases cited by counsel for the plaintiff in the brief wherein evidence of habit or custom was excluded were based upon failure to establish regularity of the action in question, upon matters of local policy, upon matters of character, or upon matters of relevancy, none of which are analogous to or involved in the situation in the case at bar.

The case of *Knickerbocker Life Insurance Company* v. *P. H. Pendleton et al.*, 115 U. S. 339, 29 L. ed. 432, wherein the Supreme Court of the United States ruled competent evidence of the custom and usage of a bank always to present drafts for acceptance and payment, is sought to be distinguished by counsel for the plaintiff on the ground that the Court held the evidence admissible only for the purpose of

sustaining and corroborating the conviction and belief of the bank cashier that a draft was duly presented for payment. It is urged that the case permitted evidence of custom *not* as primary evidence sufficient in itself to establish a controverted fact, but as corroborative or explanatory of direct, positive evidence.

It is clear from a reading of the facts as given in the opinion, however, that the testimony of the witness as to the fact of whether the draft had been presented for either acceptance or payment was not based upon any specific recollection of the events, but solely upon the custom and usage of the bank. In fact, the witness stated that he had not presented the bill in person nor was he present when it was presented, for the reason that it was not his duty as cashier of the bank to present drafts either for acceptance or payment, and the Court said:

\* \* \* His conviction and belief [that the draft was presented] were undoubtedly based on this custom and usage, and were of value only so far as such custom and usage were invariably maintained and pursued.

In the case of *Joseph R. Dunlop* v. *United States*, 165 U. S. 487, 41 L. ed. 799, the Supreme Court had occasion to cite the *Knickerbocker Life Insurance Company* case, *supra*, and commented thereon as follows:

\* \* \* Indeed, the authorities are abundant to the proposition that, where a question is made whether a certain paper or other document has reached the hand of the person for whom it is intended, proof of a usage to deliver such papers at the house, or of the duty of a certain messenger to deliver such papers, creates a presumption that the paper in question was actually so delivered. Business could hardly be carried on without indulging in the presumption that employees, who have certain duties to perform and are known generally to perform such duties, will actually perform them in connection with a particular case. \* \* \*

As we are satisfied that the evidence sought to be introduced should have been admitted, we therefore set aside the submission of the case made by the parties and restore the case to the next New Orleans docket of this court. In view of the fact that our ruling may change the evidentiary situation of the parties, the case is so restored to the docket for all purposes. *Geo. S. Bush & Co., Inc., et al.* v. *United States*, 22 Cust. Ct. 158, C. D. 1175.

It is so ordered.

### DISSENTING MEMORANDUM

COLE, Judge: This case is to be restored to the New Orleans docket solely because the trial judge, a member of this court on circuit, authorized by statute, 28 U. S. C. (1946 ed., Supp. III) § 254, to hear and determine this and other cases before him at that port, sustained objections to certain questions asked of the witness Perez, and the majority, sitting not as a court in review or on appeal, but as a division of this court, having jurisdiction, as is claimed, to decide such litigation

to the total exclusion of the trial judge participating therein, feels that certain rulings were erroneous and that the witness should have been permitted to testify.

The majority cites in support of its position *Geo. S. Bush & Co., Inc., et al.* v. *United States*, 22 Cust. Ct. 158, C. D. 1175. My dissenting views set forth at some length in the said *Bush* case are equally applicable here.

Feeling so very strongly, as I do, that under the law governing the practice and procedure before this court, for a division of three judges to take over decision in a case which, in its entirety, was tried and submitted on circuit, away from New York, before a single judge directed to then-and-there hear and determine such litigation is wrong, I must most respectfully dissent from the majority views expressed herein.

It has been my position, and I restate with much emphasis here, that a member of this court on circuit is a United States judge conducting the trial of a case and it is his duty in doing so to conduct such trial as he believes to be proper, thereby making such rulings as, in his opinion, are legal and sound, and, thereafter, when such case is submitted before him and the litigation is closed, he, individually, should decide the same.

But in this instance, where there is no authority spelled out in the law, permitting any division of this court to review rulings made during the course of a trial before a single judge, except in reappraisement proceedings when the division functions with appellate jurisdiction, clearly such a division has no authority, which the majority has undertaken herein, to tell the trial judge how he shall conduct proceedings before him and rule on the admissibility of evidence offered at the time.